**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-00375 (CKK)** |
| **v.** | : | |
| | : | |
| **THOMAS CAREY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Thomas Carey to 60 days' incarceration, 3 years of probation, and $500 in restitution.

## I.      Introduction

Defendant Thomas Carey, a 22-year-old recent college student, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Defendant Carey pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 60 days' incarceration and 3 years of probation is appropriate in this case because Carey: (1) accessed sensitive areas of the U.S. Capitol building; 2) remained inside the U.S. Capitol building for approximately 30 minutes; (3) stood by while a member of his group rammed a bicycle rack into an officer; and (4) participated in the chaos by removing (and then returning) media items damaged by rioters.

1

The Court must also consider that Carey's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Carey's crime support a sentence of 60 days' incarceration, 3 years of probation, and $500 in restitution in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 51, Statement of Offense, at 1-7.

### Defendant Carey's Role in the January 6, 2021 Attack on the Capitol

The FBI investigated Carey and his co-defendants Joseph Brody ("Brody"), Paul Lovley ("Lovley"), Jon Lizak ("Lizak"), and Gabriel Chase ("Chase") for illegal acts committed on January 6, 2021, at the U.S. Capitol grounds and inside the U.S. Capitol building.[1]  The group, all members at the time of America First,[2] decided to heed the call by America First leadership to attend rallies in Washington D.C.  Carey traveled with Lizak by car and met the others at Lovely's house in Maryland the evening of January 5.  They regrouped the following morning in Washington D.C. to attend rallies there.

---

[1] Gabriel Chase and Paul Lovely have pled guilty to the same charges and are set for sentencing. Joseph Brody continues to have felony charges pending.

[2] "Through his nightly 'America First' show and his America First Foundation, [Nick] Fuentes has stated his aim is to remake the Republican Party into 'a truly reactionary party.' In livestreams and public appearances, Fuentes has described his goal as working within the political system to become 'the right-wing flank of the Republican Party.' He sees America's 'white demographic core' as central to its identity."  https://www.splcenter.org/fighting-hate/extremist-files/individual/nick-fuentes, visited March 23, 2023.

Afterwards, Carey and his group went to the Capitol grounds and entered the U.S. Capitol building after it had been breached by rioters.  Their movements inside the U.S. Capitol building were captured by surveillance cameras and open-source videos.  In Figure 1, below,  Carey is circled in purple, Chase is circled in **blue**, Lovley is circled in **orange**, and Lizak is circled in **green**, and Brody is circled in **red**.



Figure 1

Carey and his group entered the U.S. Capitol building through the Senate Wing door along with many other rioters at approximately 2:16 p.m. that day.  *See* Figure 2, below.



Figure 2

Carey and his group then proceeded towards the Crypt. After a few minutes, the crowd of rioters inside the Crypt pushed past police officers and proceeded south into a room containing busts of historical figures, known as the "Corridor of Honorary Citizens." *See* Figure 3, below.



Figure 3

Carey and his group moved with the crowd down the hallway and near several offices, including "Office of the Clerk," and "Office of the Majority Leader | Steny H. Hoyer." *See* Figures 4 through 6, below



Figure 4



Figure 5



Figure 6

Carey and his group reentered the Crypt and entered a room containing a spiral stairwell. The group of rioters ascended the stairwell; at least some were ominously chanting, "NANCY! NANCY!  NANCY," in an obvious reference to then Speaker of the House Nancy Pelosi. At the top of the stairwell, the rioters continued forward and entered a small atrium, which displayed a plaque reading, "Speaker of the House | Nancy Pelosi."  Carey and his group entered a conference room for Speaker Pelosi's Office. *See* Figure 7, below.



Figure 7

Carey and his group left Speaker Pelosi's Office and entered the Rotunda.  The group loitered within the Rotunda for several minutes.   At approximately 2:42 p.m., after departing the vicinity of the Rotunda, Carey and his group  marched together and ascended the House Gallery Stairs to the third level of the Capitol, where they proceeded through the Senate East Corridor. They proceeded to the Senate Chamber and stopped outside of the doors labeled respectively as Secretary of the Senate's Office and the Senate Gallery Door Number 1. *See* Figure 8, below



Figure 8

The Senate Chamber—where part of the Joint Session for the Electoral College Certification vote would normally have been taking place, in accordance with 3 U.S.C. 15, and the 12th Amendment to the U.S. Constitution—was instead filled with rioters. Brody broke off from his group of associates and entered the Senate Chamber, where his actions were captured by several Senate Recording Studio cameras. While in the Chamber, Brody appeared to hold a cell phone in his hand and photograph or record the interior of the Senate Chamber—to include documents or other information on and inside several desks. *See* Figure 9, below.



Figure 9

While Brody breached and remained in the Senate Chamber, Carey and the others remained outside of the Senate Chamber. Finally, at approximately 2:50 p.m., Carey and his group began to exit the Capitol through the Senate Carriage Door. Carey exited the building at approximately 2:50 p.m., followed by Lovley and Chase at approximately 2:50:20 p.m. Approximately a minute and a half later, at 2:51:40 p.m., Brody and Lizak exited the Capitol. *See* Figures 10 through 13, below.



Figure 10



Figure 11



Figure 12



Figure 13

Eventually, Carey and his group moved to the north side of the Capitol. There, Carey

observed Brody lifting a metal barricade and appearing to use it to obstruct or assault a police

officer by pushing it up over a concrete station and against a police officer attempting to address

the crowd of rioters with what appears to be fire-extinguisher retardant or chemical-irritant spray.



Figure 14

At one point, it appears a member of the group, Chase, may have attempted to spray

something as well at the entrance.



Figure 15

After observing the attempted breach of North Door into the U.S. Capitol building, Carey and his group moved to an area in the vicinity of the U.S. Capitol where news media had set up broadcasting equipment.  Metal barricades had been erected around the equipment.  A group of rioters had breached the metal barricade and destroyed and looted the media equipment.   Carey and his group took some items from the pile of media equipment. In particular, Carey reached down and removed a broken set of headphones but then returned it to the pile. *See* Figures 15 and 16, below.



Figure 16



Figure 17

*Defendant's Interview*

Subsequent to his arrest in this case, Carey has spoken to law enforcement about the events of January 6, 2021.  He confirmed his prior involvement with America First, his attendance at the January 6, 2021 rallies in Washington D.C., his trespass into the U.S. Capitol building with his group and other rioters, and his actions outside of the building in the media area.  Carey claimed he and his group did not plan to enter the U.S. Capitol that day but admitted they entered nonetheless with other rioters after seeing the terrible events of that day and recognized he contributed to the chaos of the day with their presence there.

*The Charges and Plea Agreement*

On September 12 2022, the United States charged Carey by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D)&(G). On September 15, 2022, law enforcement officers arrested Carey in Pittsburgh, Pennsylvania.  On November 17, 2022, the United States charged Carey by a one-count Information with violating 40 U.S.C. § 5104(e)(2)(G).

On December 22, 2022, Carey pleaded guilty pursuant to a plea agreement to the Information. Because Carey has plead guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).   By plea agreement, Carey agreed to pay $500 in restitution to the Architect of the U.S. Capitol.

### III.     Statutory Penalties

Carey now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Carey faces up to six months of imprisonment and a fine of up to $5,000.  Carey must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 60 days' incarceration, 3 years of probation, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Carey's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Carey and his group spent significant time in the U.S. Capital building, accessing numerous sensitive areas including Speaker of the House Pelosi's conference room. Carey also stood by as a member of his group assaulted an officer with bike rack and participated in the pillaging of destroyed media equipment.

Accordingly, the nature and the circumstances of this offense alone establish the clear need for a sentence of 60 days' incarceration and 3 years of probation in this matter.

### B. The History and Characteristics of Carey

Carey has no criminal history and has been compliant under Pretrial Supervision.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

14

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by Carey. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The Government's recommended sentence should also discourage Carey from engaging in such activity in the future. Given his groups actions that day both inside and outside the U.S. Capitol building, it is even more important that he be deterred and supervised.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This

Court must sentence Carey based on his own conduct and relevant characteristics, but should give

substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Carey has pleaded guilty to Count One of the Information, charging him with violation of

40 U.S.C. § 5104. This offense is a Class B misdemeanor. 18 U.S.C. § 3559. The sentencing

factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of similar conduct,"

18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad

discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than

necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C.

§ 3553(a). Although unwarranted disparities may "result when the court relies on things like

alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants

whose differences arise from "legitimate considerations" such as a "difference[] in types of

charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in

sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*,

462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the

Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his

exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no case or defendant is exactly alike, the Government's recommendation is consistent with sentences handed down in other January 6 cases with similar facts. In particular, the Government has often recommended, and judges have often imposed, periods of incarceration in which defendants have spent long periods of time in the Capitol building as well as celebrated their actions and the violence involved on social media.

In *United States v. Devin Rossman*, 22-cr-280 (BAH), the defendant entered the Capitol building and remained there for almost two hours, accessed sensitive locations like the Speaker's Office and even tried to pry open doors while the staff was sheltering under their desks, and bragged on Facebook about his actions.  Chief Judge Howell sentenced Rossman to 32 days' intermittent conferment in addition to probation and community service.

In *United States v. Virginia Spencer*, 21-cr-147 (CKK), this Court sentenced the defendant to 90 days' incarceration for entering the Capitol building, being part of the group in the crypt that overran the officers there and walked into the hallways of Speaker Pelosi's office.  Carey's criminal liability for having entered Pelosi's conference room, standing by as one of his group members' assault an officer, and participated in the looting of the media circle are arguable more egregious.

Similarly, in *United States v. Erik Rau* (21-CR-467 (JEB)) and *United States v. Derek Jancart* (21-cr-148 (JEB)), the defendants entered the Capitol approximately 5 minutes after the initial breach, formed part of the critical mass in the Crypt to surge past police, entered Speaker Pelosi's office suite, and spent approximately 40 minutes in the Capitol.  Judge Boasberg

sentenced both Rau and Jancart to 45 days incarceration.  Carey's actions are arguably more egregious than theirs.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

In crafting its recommendation, the Government took into consideration not only Carey's crimes but also his limited criminal history and relatively quick resolution of this matter.[4]

---

[4] Numerous judges of this Court, including Your Honor, *see United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case),  have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *see generally Appellee's Brief for the United States, United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(1), which authorize limited periods of intermittent confinement as a condition of probation. The courts have

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Carey to 60 days' incarceration, 3 years of probation, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ Joseph Huynh
        Assistant United States Attorney
        D.C. Bar No. 495403
        Assistant United States Attorney (Detailed)
        405 East 8th Avenue, Suite 2400
        Eugene, Oregon 97401-2708
        Joseph.Huynh@usdoj.gov

</div>

---

consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

## **CERTIFICATE OF SERVICE**

On this 27 day of March 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ *Joseph Huynh*
Assistant United States Attorney
D.C. Bar No. 495403
Assistant United States Attorney (Detailed)
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401-2708
Telephone: (541) 465-6771
Joseph.Huynh@usdoj.gov